IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ASSISTMED, INC.,                        §
                                        §
          Plaintiff-                    §
          counterdefendant,             §
                                        § Civil Action No. 3:05-CV-0880-D
VS.                                     §
                                        §
CONCEPTUAL HEALTH SOLUTIONS,            §
INC.,                                   §
                                        §
          Defendant-                    §
          counterplaintiff,             §
                                        §
and                                     §
                                        §
MICHAEL FLORIMBI,                       §
                                        §
          Defendant.                    §

MEMORANDUM OPINION
AND ORDER

    This litigation arises from a failed venture to develop computer software products using natural language processing technology to manage digital medical records. The court must decide on cross-motions for summary judgment and a motion to dismiss whether there are fraud, contract, or declaratory judgment claims or counterclaims that remain to be tried and whether plaintiff can pursue certain remedies. For the reasons that follow, the court holds that plaintiff is entitled to proceed to trial on part of its breach of contract claim and on its requests for the equitable remedies of specific performance and quantum meruit, and that defendants can proceed on their counterclaim for contractual attorney's fees and costs. All other claims and

counterclaims are dismissed.

I

Plaintiff-counterdefendant AssistMed, Inc. ("AssistMed") sues defendant-counterplaintiff Conceptual Health Solutions, Inc. ("CHS") and defendant Michael Florimbi ("Florimbi"),[1] CHS's President and Chief Executive Officer, alleging a claim for fraud against CHS and Florimbi and a breach of contract claim against CHS, arising from its business dealings with CHS and Florimbi. The lawsuit centers primarily on a May 1, 2002 License Agreement ("License Agreement") between AssistMed and CHS for the development of derivative software applications based on the Mayo Vocabulary Processor ("MVP"). The MVP is comprised of software developed at the Mayo Clinic for use in coding, indexing, archiving, and retrieving medical records based on their digital medical language content, using natural language processing ("NLP"), healthcare vocabularies, and continual learning algorithms. This technology is considered to have value to medical providers in performing the tasks of coding and billing for medical procedures. In addition to its fraud and contract claims, AssistMed seeks a declaratory

---

[1]In defendants' second amended counterclaim, they identify Florimbi as a counterplaintiff and purport to assert counterclaims on his behalf. *See* 2d Am. Countercl. ¶¶ 1, 4, 17, 21, 25, and prayer. At other points in their counterclaim, however, it appears that only CHS is asserting counterclaims. *See id.* at ¶¶ 19, 20, 23, 24. But in their response brief, both defendants oppose summary judgment on the counterclaims. July 24, 2006 Br. 1. Accordingly, the court will refer to the counterclaims as if asserted by both CHS and Florimbi.

- 2 -

judgment concerning the parties' rights, obligations, and performance under the License Agreement.

AssistMed alleges that CHS agreed to work with it to develop derivative products based on the MVP, including three Specific Derivative Software Products ("SDSPs").[2] AssistMed avers that, to induce it to enter into the License Agreement, defendants falsely represented that the MVP software was already developed and complete and capable of indexing, archiving, and retrieving structured and unstructured medical data across systems using NLP and continual learning algorithms with an accuracy of over 90%. Instead, CHS failed to deliver the agreed-upon products and services, and it has sought to use technology licensed exclusively to AssistMed for other projects and customers, doing so under the entity LingoLogix, Inc. ("LingoLogix").[3] AssistMed asserts that defendants' conduct was fraudulent and that CHS breached the License Agreement.

───────────────

[2]Although all parties have moved for summary judgment, because defendants have essentially accepted voluntary dismissal of the two counterclaims that are the subject of AssistMed's motion and the court is focusing on defendants' motion addressed to AssistMed's claims, the court will recount the pertinent evidence in a light favorable to AssistMed as the summary judgment nonmovant and draw all reasonable inferences in its favor. *E.g., U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.) (citing *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000)).

[3]AssistMed alleges that CHS is, *inter alia*, the successor by merger to LingoLogix and is subject to all its liabilities and obligations.

CHS counterclaims, alleging that AssistMed is liable for fraud and/or fraudulent inducement, and for attorney's fees and costs under the License Agreement and Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (Vernon 2006).[4]  According to CHS, before the parties entered into the License Agreement, AssistMed and its President and Chief Operating Officer, Raul Kivatinetz ("Kivatinetz"), committed fraud concerning AssistMed's business, including its market share and expected growth and its ability and intent to attract investors to fund start-up and development costs for the SDSPs and other needs.  CHS also alleges that it is entitled under the License Agreement to recover its attorney's fees as the prevailing party as to claims that AssistMed has asserted.

Defendants move to dismiss AssistMed's second amended complaint, contending that it has failed to plead fraud with the specificity required by Fed. R. Civ. P. 9(b) and that its declaratory judgment action is duplicative of its breach of contract claim.  They move for partial summary judgment dismissing AssistMed's fraud, breach of contract, and declaratory judgment claims, its request for equitable relief in the form of specific performance, reformation, and quantum meruit, and its request for

---

[4]In defendants' brief in response to AssistMed's summary judgment motion, CHS abandons its claim for attorney's fees under the Texas Uniform Declaratory Judgments Act, recognizing that the Act is a state-law procedural device that is inapplicable in federal court.  Accordingly, the court need not reach this ground of AssistMed's motion.

exemplary damages.[5]

AssistMed moves for summary judgment establishing that it is entitled to recover against CHS on its breach of contract claim, dismissing defendants' fraud-based counterclaims and defenses, and dismissing CHS's counterclaim for attorney's fees under the Texas Uniform Declaratory Judgments Act.[6]

II

The court will consider together defendants' motion to dismiss and their motion for partial summary judgment. It will also address the parts of AssistMed's summary judgment motion that relate to its breach of contract claim.[7]

A

Defendants maintain that AssistMed's fraud claim must be dismissed because it has failed to plead fraud with the specificity

---

[5]In response to defendants' motion for partial summary judgment, AssistMed objects on various grounds to parts of their summary judgment evidence: the affidavits of Florimbi, Timothy D. Argo, and Brad L. Whitlock. Except to the extent the court addresses below the merits of certain objections to the Florimbi affidavit, the objections are moot because the court has not relied on the evidence. In response to AssistMed's motion, defendants object to ¶ 4 of Kivatinetz's declaration. Because the court has not relied on this evidence in deciding AssistMed's motion, the objection is moot.

[6]The court need not reach the last ground of the motion. *See supra* note 4.

[7]Although the court refers to AssistMed's breach of contract claim, it recognizes that some arguments are offered in support of AssistMed's declaratory judgment action as well. *See, e.g., infra* note 12.

required by Rule 9(b). They contend that AssistMed has not identified the statements that are allegedly fraudulent or pleaded when and where the statements were made and why they were fraudulent. Defendants move for summary judgment on AssistMed's fraud claim, positing that the alleged representations on which AssistMed relies were truthful. They maintain that, even if they were untrue, AssistMed did not and could not rely on them as a matter of law, and that AssistMed has not suffered any compensable damages as a result of the alleged misrepresentations.

AssistMed responds to defendants' motion to dismiss by asserting that it has specified in ¶ 8 of its second amended complaint the statements it maintains were fraudulent, has stated when and where the statements were made, and has pleaded why they were fraudulent. It also argues that it has provided defendants specific information by referring them to Kivatinetz's deposition, its interrogatory responses, and documentation that CHS produced. AssistMed opposes defendants' summary judgment motion, contending that it has adduced sufficient evidence of fraud to raise genuine fact issues regarding the falsity of the statements, reliance, and damages.

B

AssistMed alleges that defendants committed fraud by representing to AssistMed that the MVP software was already developed and complete and capable of indexing, archiving, and

- 6 -

retrieving structured and unstructured medical data across systems using NLP and continual learning algorithms with an accuracy of over 90%.  Instead, according to AssistMed, at the time it entered into the License Agreement with CHS, the MVP software was not fully developed, complete, installable, or operational and was not capable of being used to develop the derivative products referred to in the License Agreement.

The court need not decide whether AssistMed has pleaded fraud with the specificity required by Rule 9(b) because, assuming *arguendo* that it has, the court nevertheless holds for the reasons explained *infra* at § II(C) that defendants are entitled to summary judgment dismissing this claim.

C

1

To establish its fraud claim, AssistMed must prove that the defendant in question

> (1) made a material representation, (2) that
> was false when made, (3) [the defendant] knew
> the representation was false, or made it
> recklessly without knowledge of its truth and
> as a positive assertion, (4) [the defendant]
> made the representation with the intent that
> [AssistMed] should act upon it, and (5)
> [AssistMed] acted in reliance upon it and
> suffered injury as a result.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 322 (5th Cir. 2002) (Fitzwater, J.) (citing *Beijing Metals & Minerals Imp./Exp. Corp. v. Am. Bus. Ctr. Inc.*, 993 F.2d

- 7 -

1178, 1185 (5th Cir. 1993) (applying Texas law)). Because defendants will not have the burden of proof on this claim at trial, they can obtain summary judgment by pointing the court to the absence of evidence to support an essential element of the claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once they do so, AssistMed must go beyond its pleadings and designate specific facts showing there is a genuine issue for trial. *See id*. at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). Summary judgment is mandatory if AssistMed fails to meet this burden. *Little*, 37 F.3d at 1076. An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). AssistMed's failure to produce proof as to any essential element renders all other facts immaterial. *Edgar v. Gen. Elec. Co.*, 2002 WL 318331, at *4 (N.D. Tex. Feb. 27, 2002) (Fitzwater, J.) (citing *Celotex Corp.*, 477 U.S. at 323).

Defendants have pointed to the absence of evidence to support AssistMed's assertion that defendants made a false representation. AssistMed must therefore produce evidence that would permit a reasonable jury to find that defendants made a representation that was false.

2

In its second amended complaint, AssistMed pleads fraud on this basis:

> In order to induce AssistMed into executing the License Agreement, Florimbi and CHS falsely represented to AssistMed that the MVP software was already developed and complete and was capable of indexing, archiving and retrieving both structured and unstructured medical data across systems, using Natural Language Processing and continual learning algorithms with an accuracy of over 90%.

D. June 30, 2006 App. 2 (2d Am. Compl. ¶ 8).[8]  It asserts that Florimbi and CHS repeated these false representations many times, orally and in writing. *Id.* at 3.  According to AssistMed, at the time the License Agreement was executed, the MVP software was not fully developed, complete, installable, or operational as represented, and was not yet ready or capable of being used to develop derivative products referred to in the License Agreement. *Id.* (¶ 9).  Consequently, although AssistMed alleges, and defendants address in their motion, multiple false representations, these representations are repeated instances of the same core false statement: "that the MVP software was already developed and complete and was capable of indexing, archiving and retrieving both structured and unstructured medical data across systems, using Natural Language Processing and continual learning algorithms with

---

[8]Because the parties have briefed several motions, the court for clarity will cite the briefs and appendixes by the date filed.

an accuracy of over 90%."

In response to defendants' motion, AssistMed cites the following evidence as sufficient to raise a genuine issue of material fact: Kivatinetz's deposition testimony that the software was not fully developed and complete, that there were representations on the level of accuracy of the MVP technology that had not been delivered, and that once AssistMed had a means of determining the accuracy of the technology, it learned that the accuracy was not at the level represented and that it was clear there were aspects of the technology that needed to be improved and optimized. AssistMed also points to Kivatinetz's testimony that, when the MVP was tested in late 2002 and 2003, problems were identified, including one arising from the MVP's inability during indexing to distinguish between positive and negative findings in a medical record.[9]

AssistMed has not met its burden of producing evidence that would permit a reasonable jury to find that defendants committed fraud. AssistMed first cites Kivatinetz's assertion that the software was not fully developed and complete. When asked during his deposition to explain why the MVP was not fully developed and complete, he testified in conclusory terms that it did not perform

---

[9]AssistMed asserts two other arguments, but the court need not consider them because AssistMed has failed to produce evidence that would enable a reasonable jury to find in its favor on its fraud claim.

indexing and extracting at the represented level of accuracy, and that he could not recall what level of accuracy was actually represented, although he stated that the number 98.7 "sticks in my mind." D. June 30, 2006 App. 74. AssistMed next cites Kivatinetz's conclusory assertion that there was a representation on the level of accuracy of the MVP technology that had not been delivered. *Id.* at 51. It then relies on Kivatinetz's testimony that, while CHS was installing components, AssistMed ran some documents and did not get accuracy at the represented level, and that there were things at a high level (e.g., more refined tests to see if something was a positive or negative finding) that needed to be improved and optimized. Finally, it cites Kivatinetz's testimony that the MVP had problems such as the inability to correctly index positive and negative findings in a medical record. *Id.* at 55. But the basis for AssistMed's fraud claim is that defendants falsely represented that the MVP software was already developed and complete and capable of indexing, archiving, and retrieving structured and unstructured medical data across systems using NLP and continual learning algorithms with an accuracy of over 90%. A reasonable jury could not find based on the conclusory testimony of Kivatinetz that AssistMed cites, including proof apparently related to a higher (98.7%) level of accuracy, that this representation was false. Although the court must view the evidence favorably to AssistMed as the summary judgment nonmovant

- 11 -

and draw all reasonable inferences in its favor, given the nature of the fraud claim, AssistMed must do more than offer generalized and conclusory evidence——particularly where it appears that the witness was basing his testimony on a higher standard of accuracy than defendants allegedly represented——because a reasonable jury could not find in its favor based on such proof.  Although there are fraud cases in which testimony at this level of generality would be adequate to raise a genuine fact issue, AssistMed's fraud claim relates to what the record shows is complicated computer technology.  It would be insufficient as a matter of law for AssistMed to attempt at trial to prove its fraud claim based on Kivatinetz's conclusory assertions that the technology was incapable of performing at the represented level.

Because AssistMed has not adduced evidence that would permit a reasonable jury to find that defendants made a false representation, it cannot prevail on its fraud claim.  The court need not consider defendants' other two arguments (i.e., no reliance and no damages) because AssistMed's failure to produce proof as to this essential element renders all other facts immaterial.  *See Edgar*, 2002 WL 318331, at *4.  Accordingly, the court grants defendants' motion for summary judgment dismissing AssistMed's fraud claim.

III

Defendants[10] move on three grounds for summary judgment dismissing AssistMed's breach of contract claim: the License Agreement's limitation of liability provision bars AssistMed's claimed damages or equitable relief, AssistMed cannot prove damages, and CHS did not breach the contract.

A

The court turns first to defendants' contention that AssistMed's claim for damages and equitable relief for breach of contract is barred by the License Agreement's limitation of liability provision.

To establish a claim for breach of contract under Texas law, AssistMed must prove (1) the existence of a valid contract, (2) that AssistMed performed or tendered performance of its duties under the contract, (3) CHS breached the contract, and (4) AssistMed suffered damages as a result of the breach. *See Lewis v. Bank of Am. N.A.*, 343 F.3d 540, 545 (5th Cir. 2003) (Texas law). "[I]n general, parties to a contract are free to limit or modify the remedies available for breach of their agreement." *SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Sciences, Inc.*, 128 S.W.3d 304, 317 (Tex. App. 2004, no pet.)(citing Tex. Bus. & Com. Code Ann. § 2.719; *Frost Nat'l Bank v. Heafner*, 12

_____

[10]AssistMed's breach of contract claim is only asserted against CHS.  For ease of reference, the court will refer to "defendants" rather than to "CHS," unless the context requires otherwise.

- 13 -

S.W.3d 104, 110-11 (Tex. App. 1999, pet. denied)).  "If the parties agree to a contractual remedy, that remedy will be enforced unless it is illegal or against public policy." *Id.* (citations omitted).

Section 14 of the License Agreement provides:

> IN NO EVENT SHALL CHS BE LIABLE TO [ASSISTMED], ITS SUCCESSOR AND/OR ASSIGNS, END USERS, AND/OR SUB-LICENSEES FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OR DAMAGES DUE TO LOSS OF USE OF DATA OR LOSS OF PROFITS ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR OUT OF THE USE OF OR IN CONNECTION WITH SDSPs.  ADDITIONALLY, CHS SHALL NOT BE LIABLE, REGARDLESS OF THE FORM OF ACTION, FOR ANY CLAIM ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT BROUGHT MORE THA[N] ONE (1) YEAR AFTER THE CAUSE OF ACTION THEREFOR[ ] HAS ACCRUED.  *NOR FOR ANY SUCH CLAIM IN AN AGGREGATE TOTAL AMOUNT IN EXCESS OF AMOUNTS PAID HEREUNDER DURING THE PRECEDING 12 MONTHS.*

Ds. App. 23 (emphasis added).  Defendants maintain that, under this clause, the most that CHS can be liable for under the License Agreement is the total amount of royalties that AssistMed paid CHS during the preceding 12-month period.  And because it is undisputed that AssistMed never paid CHS any royalties, AssistMed cannot recover damages for breach of contract.

AssistMed responds that defendants cannot rely on § 14 because the clause was never triggered.  It posits that the License Agreement must be given a reasonable interpretation and that, so interpreted, § 14 does not apply where CHS never sufficiently performed under the License Agreement.  AssistMed also maintains that defendants' interpretation of § 14 would render many other

- 14 -

express terms of the License Agreement meaningless by essentially making some of CHS's mandatory obligations optional. Alternatively, it contends that this clause does not bar an award of monetary compensation ancillary to an award of specific performance.

B

The court rejects AssistMed's contention that § 14 cannot reasonably be construed according to its plain meaning.

> Under Texas law, the court's primary concern when interpreting a contract is to ascertain the parties' true intentions as expressed in the instrument. To achieve this objective, the court should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. Language should be given its plain and grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated. Where the contract can be given a definite legal meaning or interpretation, it is not ambiguous and the court will construe it as a matter of law. A contractual provision is ambiguous when its meaning is uncertain and doubtful or if it is reasonably susceptible to more than one interpretation. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered.

*Bank One, Texas, N.A. v. FDIC*, 16 F.Supp.2d 698, 707 (N.D. Tex. 1998) (Fitzwater, J.) (citations omitted).

Construing the License Agreement in its entirety, harmonizing and giving effect to all its provisions so that none is rendered

- 15 -

meaningless, and affording the language of the agreement its plain and grammatical meaning, it is clear that AssistMed and CHS agreed to limit damages for any claim, including breach of contract, to what AssistMed had paid CHS in royalties.  Section 14 is a limitation of liability clause that is written entirely in uppercase type and reflects the parties' intent to limit a broad array of types and categories of damages.  It not only limits CHS's liability to the total paid in royalties during the preceding 12 months, but it also shields CHS from liability for indirect, incidental, consequential, or punitive damages, or damages due to loss of use of data or loss of profits arising under or in connection with the License Agreement or out of the use of or in connection with SDSPs.  AssistMed attempts to characterize one sentence of § 14 as unreasonable because it would limit AssistMed's damages to zero if, for example, AssistMed paid no royalties because CHS's performance was so deficient as to excuse AssistMed from the obligation to pay them.  But if this argument is correct, the balance of § 14 would also be "unreasonable."  That is, it would also be "unreasonable" to excuse CHS from liability for indirect, incidental, consequential, or punitive damages, or damages due to loss of use of data or loss of profits arising under or in connection with the License Agreement or out of the use of or in connection with SDSPs where its performance was so deficient that it caused AssistMed to suffer such damages.  If the court were

- 16 -

to accept AssistMed's argument, it would be required not only to read the last sentence of § 14 as "never triggered" in circumstances where AssistMed had paid no royalties as a result of CHS's deficient performance, but it would also be obligated to disregard § 14 in its entirety.  Such a reading would not square with the plain meaning of § 14 or of the License Agreement as a whole.  Moreover, AssistMed is asking the court to read into § 14 language that is not contained there: that the limitation on damages to the amount of royalties paid applies only when royalties are paid.

Nor can the court accept AssistMed's contention that interpreting § 14 as does CHS would render meaningless other contractual provisions that mandate CHS's performance obligations. AssistMed argues that certain of CHS's contractual obligations would be rendered optional because, without a remedy in damages, AssistMed could not enforce CHS's obligations.  But contractual limitations on liability will almost always reduce to some extent the incentives for a benefiting party to perform its contractual obligations.  If that were enough to vitiate a limitation of liability proviso, such clauses could rarely, if ever, be enforced, falling prey to the argument that some mandatory contractual obligation was rendered unenforceable and "meaningless."  Yet Texas law makes clear that such clauses will be enforced unless they are illegal or are against public policy.  And this rule necessarily

applies in instances where a party has undertaken mandatory contractual obligations that, if breached, are remediable only through limited relief prescribed by a contractual limitation of liability clause.

C

AssistMed argues in the alternative that it is entitled to a monetary recovery in connection with its prayer for specific performance because such an award is in the nature of equitable relief and thus not contract damages. But the limitation of § 14 is not restricted to contract damages. It limits CHS's liability for "any claim arising out of or in connection with this agreement" to what has been paid during the preceding 12 months, "regardless of the form of action." Ds. June 30, 2006 App. 23 (uppercase type converted to lower case). Therefore, it does not matter whether Texas law would characterize the recovery AssistMed seeks as equitable relief rather than damages for breach of contract. Because AssistMed's claim indisputably arises out of or in connection with the License Agreement, the limitation of § 14 applies regardless of the form of action.

Accordingly, because under the plain meaning of the License Agreement AssistMed cannot recover in damages more than what it has paid in royalties, and since it is undisputed that AssistMed has not paid any royalties, the court grants defendants' motion to the extent that it holds that AssistMed cannot recover monetary relief

from CHS based on its claim for breach of contract.  The court need not address defendants' alternative argument that AssistMed has no evidence of damages arising from a breach of the License Agreement.

D

Defendants contend that AssistMed cannot recover for breach of contract because CHS did not breach the License Agreement.[11] AssistMed maintains in its response and in its own summary judgment motion that CHS breached the License Agreement by not delivering the required SDSPs and by violating the exclusive license clause.[12]

1

Defendants divide AssistMed's breach of contract claim into two parts.  Because AssistMed follows this convention in its response brief, the court will do so as well.  The first component of the claim——"breach of performance"——alleges that CHS breached the License Agreement by failing to perform under §§ 2(a) and 3(e)(1).  The second part——"breach of exclusive license"——avers

---

[11]Although the court has already held that AssistMed cannot recover monetary relief pursuant to its claim for breach of contract, see *supra* § III(B) and (C), it must address the merits of AssistMed's breach of contract claim because it may still be entitled to the equitable remedy of specific performance.  *See infra* § IV(A).

[12]In its brief in support of its own motion, AssistMed seeks summary judgment establishing that the License Agreement was not terminated for the reason CHS asserted, and that CHS does not have the right to refuse to develop any SDSP.  Although AssistMed is not entitled to summary judgment establishing the validity of these claims, the court considers them below to the extent they bear on defendants' entitlement to summary judgment dismissing AssistMed's breach of contract claim.

- 19 -

that CHS breached §§ 1(e), 3(a), and 12(b) by delivering AssistMed's licensed technology to other entities. Defendants maintain that CHS did not breach the License Agreement in either respect. AssistMed argues in its motion that it is entitled to summary judgment establishing the merits of both claims.[13]

Because defendants will not have the burden of proof on AssistMed's breach of contract claim at trial, they can, as here, point the court to the absence of evidence to support it. AssistMed must then go beyond its pleadings and produce evidence that would permit a reasonable jury to find in its favor. For AssistMed to obtain summary judgment in its own right, it "must establish 'beyond peradventure all of the essential elements of the claim.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). This is because AssistMed will have the burden of proof on this claim at trial.

2

a

The court turns first to AssistMed's breach of performance claim, and it begins by identifying its proper scope. This claim rests primarily on two provisions of the License Agreement:

---

[13]AssistMed also asserts in its brief that the court should grant declaratory relief based on its summary judgment motion.

§§ 3(e)(1) and 2(a).  Section 3(e)(1) provides that "[AssistMed] shall meet the following schedule":

> Within forty-five (45) days after CHS delivers the necessary information relative to SDSPs to [AssistMed], [AssistMed] and CHS shall formulate product specifications for the SDSPs and [AssistMed] shall formulate requirements for the SDSPs-AssistMed product interface and deliver all such information to CHS.  In addition, during said period, [AssistMed] and CHS shall jointly develop acceptance testing procedures.

*Id.* at 17-18.  Section 2(a) of the License Agreement states: "Upon execution of this Agreement, CHS shall continue the development, at its sole cost and expenses, of three (3) specific SDSPs which are herein described in Exhibit 'A' attached hereto and made a part hereof of this Agreement."  Ds. June 30, 2006 App. 16.

In ¶ 11 of its second amended complaint, AssistMed alleges that the "initial information" required under § 3(e)(1) "includ[ed] but [was] not limited to a documented and working version [of] MVP." *Id.* at 3-4 (2d Am. Compl. ¶ 11).  In ¶ 12 AssistMed alleges that CHS breached the contract by failing to deliver a documented and working version of the MVP and the three SDSPs.  *Id.* at 4 (2d Am. Compl. ¶ 12).  In its summary judgment response brief, however, it acknowledges that a proof of concept version of the MVP was delivered, and it focuses on SDSPs.  *See* P. July 20, 2006 Br. 25. And a fair reading of AssistMed's brief in support of its own motion shows that it is relying on CHS's failure to deliver SDSPs, not other "necessary information," as the basis for the failure-to-

- 21 -

perform component of its breach of contract claim. *See, e.g.,* P. June 30, 2006 Br. 3-4 (contending that, at a minimum, § 3(e)(1) must be construed so that "necessary information" includes SDSPs, and asserting that CHS breached License Agreement by failing to deliver SDSPs). Accordingly, while the concept of "necessary information" may be broader for other purposes——such as in determining whether AssistMed had a full 45-day period to perform under the License Agreement——AssistMed has not preserved a breach of performance claim under § 3(e)(1) of the License Agreement that is broader than a failure to deliver SDSPs.

Concerning § 2(a), AssistMed's briefing shows that it is alleging that CHS breached this provision of the License Agreement by failing to develop all three SDSPs. *See* P. June 30, 2006 Br. 9 (arguing that § 2(a) obligated CHS to develop all three SDSPs).

In sum, AssistMed's breach of performance claim is based on the premises that CHS was obligated under § 3(e)(1) of the License Agreement to deliver SDSPs and under § 2(a) to develop all three SDSPs. When AssistMed's brief in opposition to defendants' motion and its brief in support of its own summary judgment motion are read together, they exclude any additional or alternative bases for its breach of performance claim.

b

Defendants argue that AssistMed cannot recover on its breach of performance claim because the summary judgment evidence

establishes that CHS performed its obligations under the License
Agreement by providing AssistMed a demonstration version of the MVP
software in 2002.  They also posit that CHS performed by assigning
a consultant to coordinate the development of derivative software
with AssistMed and because Florimbi began a campaign to encourage
AssistMed to participate in the development of product
specifications and requirements.  Defendants also assert that
AssistMed ignored its contractual obligations by failing to provide
CHS adequate technology, functionality, or user specifications that
were necessary to development an SDSP and by not introducing CHS to
an AssistMed user or customer.  Defendants reject AssistMed's
allegation that CHS breached the License Agreement by failing to
comply with obligations that defendants maintain are not found
within the License Agreement, i.e., failing to deliver a documented
and working version of MVP and/or a complete, installable, and
marketable copy of MVP or any SDSP.  They point to the parties'
obligations under § 3(e)(1) and contend that only after those tasks
were completed could the parties develop a complete, installable,
and marketable copy of an SDSP.

    AssistMed responds that defendants' arguments ignore the clear
language of the License Agreement and the factual development of
the case.  It maintains that because Mayo Foundation provided the
apparently preexisting proof of concept to AssistMed, defendants
are arguing that CHS was required to do virtually nothing to comply

with § 3(e)(1), or apparently are asserting that as long as CHS did something, regardless how ineffective, and called it "necessary information," CHS complied with its duties under § 3(e)(1).

AssistMed also contends that its obligations under the License Agreement began 45 days after CHS delivered "necessary information" under § 3(e), and pretrial discovery shows that this was an ongoing process, including email communications dated as late as mid-December 2004.   According to AssistMed, even assuming that CHS finished providing this information in mid-December, AssistMed never had the opportunity to complete its contractual performance because CHS improperly terminated the License Agreement on December 16, 2004.

In its own summary judgment motion, which it also relies on to oppose defendants' motion, AssistMed maintains that CHS did not provide all the "necessary information" required under § 3(e)(1), and that there is a genuine issue of fact concerning defendants' performance that must be resolved at trial.   AssistMed reasons that the License Agreement as a whole requires the court to hold that CHS's performance under § 3(e)(1) included providing actual SDSPs, not the MVP demonstration alone.   It urges that although § 3(e)(1) refers to delivery of information "relative to SDSPs," § 3(e)(2) addresses the next phase of development and provides for alpha and beta testing to commence according to § 3(b), which states that SDSPs are to be tested once CHS delivers each SDSP to AssistMed.

AssistMed posits that it could not test SDSPs without their being delivered.  And because Florimbi has conceded that no SDSPs were ever developed under the License Agreement, CHS did not deliver "necessary information," or there is a fact question concerning defendants' assertion that CHS delivered "necessary information" and fully performed under the contract.

Concerning § 2(a), AssistMed maintains that defendants acknowledge that the breach of contract claim is based in part on this section but then fail to address CHS's failure to perform under this provision.  AssistMed cites the language of § 2(a) and (b) to argue that CHS breached its obligations by failing to develop all three SDSPs under the License Agreement. Alternatively, it argues that there is a fact issue regarding whether CHS breached the contract in this respect.

c

i

The court first considers AssistMed's breach of performance claim based on § 3(e)(1) of the License Agreement.  The court has set out *supra* at § III(B) several well-settled principles that govern the court's interpretation of the License Agreement, and it applies them here.  Having considered § 3(e)(1) in light of these principles, the court concludes that CHS's obligation to deliver "necessary information" did not require that it deliver an SDSP.

Section 3(e) as a whole prescribes a "schedule" that AssistMed

- 25 -

must meet.  Ds. June 30, 2006 App. 17.  Section 3(e)(1) provides
that CHS must deliver to AssistMed necessary information relative
to SDSPs.  Within 45 days after the delivery, AssistMed and CHS
must formulate product specifications for the SDSPs and
requirements for the SDSPs-AssistMed product interface and deliver
this information to CHS, and they must jointly develop acceptance
testing procedures.  Section 3(e)(2) provides that alpha and beta
testing is to commence in accordance with § 3(b).  Section 3(b)
provides that, "[o]nce CHS delivers to [AssistMed] each SDSP, *in
conformance to the specifications jointly developed by CHS and
[AssistMed] as set forth in Section 3(e)(1)*, [AssistMed] shall
commence alpha and beta testing in conformity with the jointly
developed test procedures."  *Id.* (emphasis added).  When these
sections are read together, it is clear that the parties intended
the following: CHS was obligated to deliver to AssistMed the
information necessary to enable CHS and AssistMed to jointly
develop product specifications for SDSPs.  Within 45 days after
delivery of this information, AssistMed and CHS were required to
formulate these product specifications and requirements for the
SDSPs-AssistMed product interface and deliver the information to
CHS, and they were obligated to jointly develop acceptance testing
procedures.  CHS was then required to deliver SDSPs to AssistMed
that conformed to the specifications that CHS and AssistMed had
jointly developed.  Once that occurred, AssistMed was obligated to

commence alpha and beta testing in conformity with the jointly developed test procedures. Under this interpretation of the License Agreement, CHS was not obligated to deliver an SDSP to AssistMed until after CHS and AssistMed had jointly developed product specifications for the SDSP, which never occurred. In other words, § 3(e)(1), the provision on which AssistMed relies, did not obligate CHS to deliver an SDSP.

ii

AssistMed also contends that CHS breached § 2(a) of the License Agreement. Considering together AssistMed's brief in support of its motion and its brief in opposition to defendants' motion, the court concludes that AssistMed is arguing that CHS breached this section by failing to develop all three SDSPs. *See* P. June 30, 2006 Br. 9; P. July 20, 2006 Br. 26.

In support of their summary judgment motion, defendants cite Florimbi's affidavit for the proposition that AssistMed took no steps to perform its development obligations under the License Agreement, i.e., that it never provided adequate technology, functionality, or user specifications to CHS that were necessary for the development of an SDSP. They maintain that CHS was therefore unable to develop any SDSPs and consequently did not breach the License Agreement. *See* Ds. June 30, 2006 Br. 35 (citing

Ds. App. 590 at ¶ 21).[14]

In response to defendants' motion, AssistMed offers three paragraphs of conclusory assertions to support the premise that CHS failed to perform under § 2(a) and that there is a genuine issue of material fact whether CHS breached the License Agreement. *See* P. July 20, 2006 Br. 26. The only citations to the summary judgment record are to the content of § 2(a) and (b) of the License Agreement and to Florimbi's admission that in December 2004 no SDSPs had been developed. None of this evidence addresses the basis for defendants' contention that AssistMed cannot prove a breach of contract claim: that CHS was unable to develop any SDSPs without the necessary technology, functionality, or user

---

[14]AssistMed objects to Florimbi's entire affidavit on the ground that it is not made on personal knowledge, as Rule 56(e) requires. P. July 20, 2006 Br. 4. The court overrules the objection to the extent pertinent to the part of the affidavit on which the court relies in deciding defendants' motion. Florimbi states in ¶ 1 of his affidavit that he is "personally acquainted with the facts herein stated." Ds. June 30, 2006 App. 583. This court has held——at least in the context of opposition affidavits——that an "affidavit need not affirmatively state that the affiant is competent to testify so long as the record as a whole shows that [the] testimony meets the requirements of Rule 56." *Crank v. Crank*, 1997 WL 538736, at *4 (N.D. Tex. Aug. 21, 1997) (Fitzwater, J.) (citing *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir. 1987); *Brueggemeyer v. Am. Broad. Cos.*, 684 F. Supp. 452, 463 (N.D. Tex. 1988) (Fitzwater, J.)), *aff'd*, 146 F.3d 868 (5th Cir. June 4, 1998) (unpublished table decision) (per curiam). The court concludes that Florimbi's affidavit meets this standard, at least with respect to the portion on which the court relies. AssistMed also objects specifically to the last two sentences of ¶ 21, *see* P. July 20, 2006 Br. 5, but the court is not relying on these sentences and need not address the merits of the objection.

specifications.  AssistMed has failed to cite the court to evidence that would permit a reasonable jury to find in AssistMed's favor in this respect.

But this failure does not result in summary judgment dismissing this aspect of AssistMed's breach of performance claim. In its opposition response and in its brief in support of its own motion (which it incorporates in its response),[15] AssistMed introduces evidence that would permit a reasonable jury to find that AssistMed was not afforded the full 45-day period provided by § 3(e)(1) to perform under the License Agreement.  According to AssistMed's proof, CHS was still providing AssistMed with "necessary information" within 45 days of the date CHS terminated the contract.  Defendants refute AssistMed's interpretation of this evidence, characterizing it as no more than a series of emails regarding a December 2004 meeting.  But a reasonable jury could interpret the evidence as does AssistMed.  In response to a discovery request, CHS cited the documents on which AssistMed relies——identified as CHS 442-452 (P. July 20, 2006 App. 99-109)——as "necessary information" provided under § 3(e)(1).  *See* P. July 20, 2006 App. 93 (citing CHS 442-452).  CHS also referred to the meeting at Johns Hopkins University ("JHU") in late 2004 as a

---

[15]There are instances in which the court will not permit a summary judgment nonmovant to incorporate evidence from a separate motion into an opposition response.  In this case, however, the cross-motions are sufficiently linked that the court will allow AssistMed to rely on its own motion as well.

step taken in providing "necessary information." *Id.*

Defendants' argument for defeating AssistMed's breach of contract claim based on § 2(a) of the License Agreement is that CHS was excused from performing due to AssistMed's failure to provide adequate technology, functionality, or user specifications that were necessary for the development of an SDSP. Under Texas law, if AssistMed prevented CHS from performing the License Agreement, CHS's performance is excused. *See, e.g., Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 239 (Tex. App. 1994, writ denied) (holding that performance is excused when party to contract prevents other party from performing); *see also O'Shea v. IBM Corp.*, 578 S.W.2d 844, 846 (Tex. Civ. App. 1979, writ ref'd n.r.e.) (same). But by the same token, if CHS prevented AssistMed from performing, AssistMed's performance is also excused. Because a reasonable jury could find that the 45-day period had not expired and that CHS prevented AssistMed from performing, defendants cannot obtain summary judgment dismissing AssistMed's breach of performance claim on the ground that CHS was excused from meeting its contractual obligations under § 2(a) due to AssistMed's failure to provide necessary technology, functionality, or user specifications to develop SDSPs.

Accordingly, the court denies defendants' motion to the extent they seek summary judgment dismissing the § 2(a)-based component of AssistMed's breach of performance claim, i.e., that CHS breached

- 30 -

this section of the License Agreement by failing to develop all three SDSPs.  The court also denies AssistMed's cross-motion, in which it seeks summary judgment affirmatively establishing this component of the claim.  Based on the foregoing reasoning, the court concludes that AssistMed cannot establish beyond peradventure that it is entitled to summary judgment.

3

Defendants maintain that they are entitled to summary judgment dismissing AssistMed's breach of exclusive license claim. AssistMed moves for summary judgment establishing that CHS violated the exclusive license clause of the License Agreement.[16]

a

AssistMed alleges that CHS breached the exclusivity provisions of the License Agreement by delivering AssistMed's SDSPs to JHU and by transferring AssistMed's SDSPs to LingoLogix.  Defendants argue that this component of AssistMed's breach of contract claim must be dismissed because the License Agreement establishes that AssistMed was not granted an exclusive license.  Citing the language of § 3(a) that provides that obtainment of an exclusive license is

---

[16]Concerning the exclusive license claim, AssistMed's brief in support of its own summary judgment motion is substantially similar, if not virtually identical, to the part of its response brief that addresses this claim.  The court will therefore discuss AssistMed's arguments and evidence as set forth in its response brief, but the court's reasoning would not change if it were to rely instead on AssistMed's brief in support of its own summary judgment motion.

"expressly subject to the terms of this Agreement and the specific schedule set forth in Section 3(e)," and that "[t]he commencement date for the exclusive grant for each of the SDSPs shall be the date [AssistMed] accepts each of the SDSPs," Ds. App. 17, defendants argue that the parties were required to develop an SDSP under § 3(e), and that AssistMed was required to accept the SDSP, in order for AssistMed to obtain an exclusive license, and that the summary judgment record reflects that CHS and AssistMed never succeeded in developing any SDSPs.

Defendants also contend the License Agreement unambiguously establishes that CHS's dealings with JHU did not breach the contract because § 3(a) gave AssistMed an exclusive license only in the "Field," which the License Agreement defines as the medical transcription market.  Because there is no evidence that JHU operates in the same "Field," CHS did not breach the License Agreement even if the court assumes *arguendo* that AssistMed had an exclusive license.  Defendants also posit that there is no evidence that CHS breached an exclusive license because there is no way——absent a developed SDSP——to compare JHU's software to AssistMed's software, and there is no evidence that JHU's software meets AssistMed's technical product specifications or requirements and thus establish that the software breached AssistMed's license.

Concerning LingoLogix, defendants argue that AssistMed's claim fails because there has been no illegal or unlawful transfer of

technology to a separate corporation or evidence or legal reason
why such a transfer violated the License Agreement.   And the
summary judgment record shows that CHS rather than LingoLogix has
always held the right to develop derivative software based on the
MVP technology.

     AssistMed responds that, by providing SDSPs to third parties,
CHS destroyed its ability to deliver an exclusive license to
AssistMed, and thus breached the License Agreement.   It maintains
that the summary judgment evidence establishes that CHS violated
the agreement to make MVP-based derivative software available
exclusively to AssistMed by using the MVP software in software that
it developed for JHU.   AssistMed cites similarities between the
general features of "CodeAccess"——one of the three never-developed
SDSPs that are the subject of the License Agreement——and the JHU
"OptiCode" software.   It argues that JHU's software falls within
the "Field" that the License Agreement reserves exclusively to
AssistMed.   AssistMed concludes that this is clear evidence of a
breach of the exclusive license provision and a fact issue that
precludes summary judgment.

     As to LingoLogix, AssistMed points to its objection to the
affidavit of Brad L. Whitlock.   It also contends that the failed
attempt to transfer CHS's assets to LingoLogix violated § 12(c) of
the License Agreement because CHS warranted that it would have
throughout the term of the contract the exclusive licensing rights

necessary to enable it to license the MVP and SDSPs.

b

Even if the court assumes *arguendo* that AssistMed obtained an exclusive license in the SDSPs and that JHU operated in the "Field" reserved exclusively to AssistMed, AssistMed has not cited summary judgment evidence that would permit a reasonable jury to find that the JHU OptiCode software violates the exclusive license. Defendants have pointed to the absence of evidence that the JHU software is comparable to an SDSP——because no SDSP was ever jointly developed——and have produced evidence that the JHU application is materially different.  The evidence AssistMed cites in response is Exhibit A to the License Agreement, *see* P. July 20, 2006 Br. 28 (citing P. App. 22), which describes "CodeAccess," and deposition testimony of Florimbi concerning the JHU software, *id.* (citing P. App. 88-89).[17]  This evidence merely describes at a general level the CodeAccess and JHU software.  It would not permit a jury reasonably to find that the JHU application is sufficiently similar to an SDSP that it violates AssistMed's exclusive license.

As to LingoLogix, AssistMed has not shown that a reasonable jury could find that CHS breached the License Agreement by attempting unsuccessfully to transfer assets to that entity.

_____

[17]Differences in the evidence that AssistMed cites in its own brief versus what it cites in its response brief appear to be the result of differences in the pagination of the relevant appendixes. (AssistMed correctly followed the court's local civil rules by filing two appendixes.)  The court therefore cites the evidence that AssistMed relies on in its response brief.

The court therefore concludes that AssistMed's breach of exclusive license claim cannot serve as a predicate for its breach of contract claim, and this component of the claim is dismissed. The court denies AssistMed's motion to the extent it seeks summary judgment establishing that CHS breached the exclusive license clause of the License Agreement.[18]

IV

Defendants next move for summary judgment dismissing AssistMed's requests for equitable relief in the form of specific performance, reformation, and quantum meruit.

A

The court turns first to AssistMed's request for specific performance. Defendants contend they are entitled to summary judgment dismissing this request because AssistMed is seeking equitable relief for personal services that exceeds what CHS is contractually obligated to perform under the License Agreement, and the requested relief exceeds the type of specific performance relief available under Texas law.[19]

---

[18]Even had the court not granted defendants' motion on this claim, it would have denied AssistMed's motion in this respect. As noted above, because AssistMed will have the burden of proof on this claim at trial, to obtain summary judgment it must satisfy the beyond-peradventure standard. AssistMed cannot meet this high standard based on the evidence it has adduced.

[19]In their reply brief, defendants assert a new basis for granting summary judgment: that specific performance is barred by the limitation of liability provision of the License Agreement. Ds. Aug. 7, 2006 Reply Br. 15. The court will not consider a new

AssistMed responds that summary judgment is premature since the court must examine all the circumstances, that specific performance is warranted in this case because the License Agreement is valid, that CHS refuses to comply with its contractual obligation to turn over all necessary information, including SDSPs, and that AssistMed lacks an adequate remedy at law. It also maintains that it is only seeking relief that falls within the scope of the License Agreement and that it is requesting specific performance for corporate, not personal, services. AssistMed maintains that it is entitled to summary judgment in its favor as a matter of law, or that a fact issue precludes summary judgment.

The court declines to grant summary judgment dismissing AssistMed's request for specific performance, because it cannot say that all such relief is precluded. AssistMed cites, *inter alia*, delivery of three SDSPs as a component of its request for specific performance. This request does not plainly exceed the scope of the License Agreement. Nor is AssistMed requesting specific performance of personal services. *See, e.g., Falk v. Axiam Inc.*, 944 F. Supp. 542, 552-53 n.3 (S.D. Tex. 1996). And although defendants maintain that Texas courts will not decree the equitable remedy of specific performance when it involves a continuous series of actions extending over a long period of time, the court cannot

---

argument made for the first time in defendants' reply brief. *See, e.g., Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC*, 749 F. Supp. 758, 772 (N.D. Tex. 1990) (Fitzwater, J.).

say at this juncture that requiring CHS to deliver SDSPs will require such an extensive period of time, or such constant and continuing court supervision, as to justify denying specific performance on motion for summary judgment. *See Roberts v. Brewer*, 371 S.W.2d 424, 425 (Tex. Civ. App. 1963, no writ) (reversing dismissal of action seeking specific performance based on conclusion that performance would require constant court supervision over long time-period where contract contained clear, concise, and unambiguous language and specific performance would simply require appellee to place appellant's machines in her place of business so long as she operated business); *see also Fraud-Tech, Inc. v. Choicepoint, Inc.*, 102 S.W.3d 366, 371-72, 386-87 (Tex. App. 2003, pet. denied) (reversing on other grounds summary judgment dismissing specific performance claim asserted in context of licensing agreement for joint development and marketing of mortgage fraud detection software).

Accordingly, without suggesting that AssistMed would be entitled to all (or any) aspects of the specific performance remedy it seeks, the court holds that at least part of this claim for relief survives summary judgment.[20]

---

[20]When this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact. *See, e.g., Swicegood v. Med. Protective Co.*, 2003 WL 22234928, at *17 n.25 (N.D. Tex. Sept. 19, 2003) (Fitzwater, J.). Accordingly, the court has discussed the minimum grounds for concluding that it cannot grant summary judgment dismissing AssistMed's request for specific performance.

B

Defendants next seek summary judgment dismissing AssistMed's claim for reformation of the License Agreement.  They maintain that reformation is only available when there has been a unilateral mistake by one party, accompanied by fraud by the other party, and AssistMed cannot show that it made a unilateral mistake in entering into the License Agreement or that there are any mistaken terms that would be subject to reformation.  They cite Kivatinetz's testimony that the License Agreement embodied the parties' deal.  AssistMed responds that Kivatinetz's testimony does not establish the absence of a mistake by AssistMed and supports its claim of fraud.

Defendants are entitled to summary judgment dismissing AssistMed's claim for reformation of the License Agreement because AssistMed misunderstands the nature of this remedy.  Under Texas law, "[w]here there has been a mistake by one party, accompanied by fraud or other Inequitable conduct of the remaining party, the instrument may be made to conform to the agreement or transaction entered into, according to the intention of the parties." *Ace Drug Marts*, *Inc. v. Sterling*, 502 S.W.2d 935, 939 (Tex. Civ. App. 1974, writ ref'd n.r.e.) (citations omitted).  In other words, the nature of the remedy is to reform the instrument——here, the License Agreement.  To obtain reformation, AssistMed must be able to point to a provision of the License Agreement that does not reflect the

parties' agreement and that was the result of AssistMed's unilateral mistake and CHS's fraud or other inequitable conduct. That is the point of defendants' reliance on Kivatinetz's testimony that the License Agreement embodied the parties' deal: to show that there is no contractual provision to be reformed.

That AssistMed is not actually seeking reformation is evidenced by an argument it makes in its response brief. It states that it expects to persuade the court that the License Agreement "should be reformed to provide AssistMed with, among other things, the promised 'developed and complete' MVP, perhaps by ordering that CHS provide AssistMed with the MVP source code so that AssistMed can develop and complete the programs itself." P. July 20, 2006 Br. 43. This is not an argument for *reforming* the License Agreement; it is one for requiring CHS *to perform under* the one the parties executed.

Accordingly, the court grants defendants' motion for summary judgment as to AssistMed's request for reformation.

C

AssistMed also seeks quantum meruit relief of at least $29.6 million "for the fair value of the critical insights, work and services provided by AssistMed to CHS." D. App. 9 (2d Am. Compl. ¶ 32).

1

Defendants move for summary judgment dismissing this requested remedy, contending that the parties entered into an express contract that covers the services for which AssistMed is seeking compensation.    They also posit that AssistMed did not provide critical insights, work, or services, and that it cannot establish that it is entitled to recover $29.6 million.

AssistMed responds that the ban on a quantum meruit recovery that applies when services are covered by express contract is inapposite when a plaintiff partially performed but was prevented from completing the contract because of the defendant's breach.    It also argues that it is seeking quantum meruit relief for services rendered before May 1, 2002 and therefore not covered by the License Agreement.    And it maintains that there is evidence to support a recovery of $29.6 million.

2

"As a general rule, a plaintiff who seeks to recover the reasonable value of services rendered . . . will be permitted to recover in quantum meruit only when there is no express contract covering those services . . . ." *Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988) (citing *Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80, 86 (Tex. 1976)).    Under Texas law, to recover under the doctrine of quantum meruit, a party must establish (1) either valuable services or materials or both were furnished, (2)

to the party sought to be charged, (3) that were accepted by the party sought to be charged, (4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)(citing *Vortt Exploration Co. v. Chevron USA, Inc.*, 787 S.W.2d 942, 944 (Tex. 1990)).  *Truly* discusses two circumstances in which a plaintiff can recover in quantum meruit despite the existence of an express contract that covers the subject matter of the claim: (1) where a plaintiff has partially performed an express contract but, because of the defendant's breach, the plaintiff is prevented from completing the contract, and (2) where a plaintiff partially performs an express contract that is unilateral in nature. *Truly*, 744 S.W.2d at 936-37.

As the court explains *supra* at § III(D)(2)(c)(ii) in addressing AssistMed's breach of contract claim, there is a genuine issue of material fact whether CHS prevented AssistMed from performing at least one aspect of the License Agreement.  The court therefore concludes that AssistMed is not precluded from recovering in quantum meruit due to the existence of the License Agreement.[21]

The court also holds that AssistMed has introduced evidence that would permit a reasonable jury to find that it provided

---

[21]The court need not reach AssistMed's contention that the License Agreement does not cover services rendered before May 1, 2002.

valuable services that CHS accepted under such circumstances that reasonably notified it that AssistMed expected to be paid. AssistMed points to Kivatinetz's testimony that he originated the idea of using the MVP software to code medical bills.  Although defendants vehemently contest this evidence, the dispute is sufficient to require resolution at trial.

Finally, even assuming *arguendo* that AssistMed's evidence concerning the value of its services would not support an award of $29.6 million, the court cannot say that a reasonable jury would be unable to find that they had any value.

Accordingly, the court denies defendants' motion to the extent directed to AssistMed's request for quantum meruit relief.

V

The court now considers AssistMed's declaratory judgment claim.

A

Defendants argue in their motions to dismiss and for summary judgment that the court should dismiss AssistMed's declaratory judgment claim because it does nothing more than duplicate AssistMed's claim for breach of contract.  They also maintain that AssistMed is not entitled to any of the relief it seeks because none is supported by the record or the contract.

AssistMed responds that this court's prior decisions dismissing declaratory judgment actions are distinguishable and

that the declaratory judgment action does not merely restate the claim for breach of contract.  It urges the court to consider both claims in tandem because there are issues in the declaratory judgment action that are not necessarily resolved in the context of the breach of contract claim.  AssistMed provides the following four examples: (1) what information is required as "necessary information relative to SDSPs" under the License Agreement;[22] (2) whether the software engine referred to as "SAVS" is the same or substantially the same as the MVP engine and subject to the terms of the License Agreement; (3) whether other software products that CHS produced are within the defined "Field" of products subject to the terms of the License Agreement; and (4) whether CHS is contractually required to develop more than one SDSP or only one SDSP.

B

Federal courts have broad discretion to grant or refuse declaratory judgment.  *See Torch, Inc. v. LeBlanc,* 947 F.2d 193, 194 (5th Cir. 1991).  "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286

---

[22]The fact that AssistMed in its declaratory judgment action asks the court to declare what is "necessary information" does not undermine the court's earlier conclusion that AssistMed is suing under § 3(e)(1) based only on the failure to deliver SDSPs.  *See supra* § III(D)(2)(a).

(1995). It gives federal courts the competence to declare rights, but it does not impose a duty to do so. *See Public Affairs Assocs. v. Rickover*, 369 U.S. 111, 112 (1962) (per curiam). Although "the district court's discretion is broad, it is not unfettered." *Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 778 (5th Cir. 1993). The court cannot dismiss a declaratory judgment action "'on the basis of whim or personal disinclination.'" *Id.* (quoting *Rowan Cos. v. Griffin*, 876 F.2d 26, 28-29 (5th Cir. 1989)).

This court has dismissed a declaratory judgment action where "[t]he core issues of th[e] controversy concern[ed] whether the parties entered into enforceable contracts and, if so, whether defendants breached the contracts." *Kougl v. Xspedius Mgmt. Co.*, 2005 WL 1421446 at *4 (N.D. Tex. June 1, 2005) (Fitzwater, J.). It reasoned that "[t]hese questions [would] be resolved in the context of breach of contract actions." *Id.* Of the four examples AssistMed cites, the first and fourth are plainly covered by AssistMed's breach of contract claim. The court has resolved what is the scope of the "necessary information" that serves as the basis for AssistMed's lawsuit, *see supra* § III(D)(2)(a). It has also addressed the breadth of the term in the context of deciding whether a reasonable jury could find that AssistMed had the full 45-day period provided by § 3(e)(1) to perform under the License Agreement. *See id.* § III(D)(2)(c)(ii). There is no apparent need

for the court to interpret the meaning of the term. And the question whether CHS is contractually required to develop one or more than one SDSP will be addressed in the context of AssistMed's § 2(a)-based breach of performance claim.

Because AssistMed in its summary judgment response has done little more than assert that the four examples "are not necessarily resolved in the context of the breach of contract action," P. July 20, 2006 Br. 48, the court has little to go on in determining that they are. Based on its review of the briefing and the record, however, the only apparent relevance of the third example——whether other software products that CHS produced are within the defined "Field" of products subject to the terms of the License Agreement——is in resolving whether JHU operated in a "Field" reserved exclusively to AssistMed. Because a reasonable jury could not find that the JHU OptiCode software violates the exclusive license, the court need not declare the parties' rights concerning the "Field" of products. And even if AssistMed could now identify other reasons for the court to resolve this issue by declaratory judgment, it did not adequately brief them.[23]

Similarly, based on AssistMed's briefing, it has failed to show why the second example——whether the software engine referred

---

[23]To the extent this issue is pertinent to AssistMed's request for specific performance, it can be adequately considered in that context and need not be addressed as a component of a declaratory judgment action.

to as "SAVS" is the same or substantially the same as the MVP engine and subject to the terms of the License Agreement——is not necessarily resolved.   The court declines in its discretion to preserve AssistMed's declaratory judgment action to resolve this single issue of uncertain importance.

The court therefore declines in its discretion to hear AssistMed's declaratory judgment action, and it dismisses the action without prejudice.

## VI

Defendants seek summary judgment dismissing AssistMed's claim for exemplary damages.   Because the court has granted summary judgment dismissing AssistMed's fraud claim——which is the only cause of action that would support an award of exemplary damages——there is no legal basis on which AssistMed can recover exemplary damages, and this claim is dismissed.

## VII

The court now turns to the ground of AssistMed's motion for summary judgment that remains to be considered: its contention that defendants' fraud counterclaims and defenses are not valid as a matter of law.   Based on the court's decision above dismissing AssistMed's fraud claim and defendants' summary judgment response, the court dismisses the fraud counterclaims and defense.[24]

_____

[24]Defendants do not address a fraud defense in their opposition brief, and they treat AssistMed's motion as if it is addressed only to their fraud counterclaims. *See* Ds. July 24, 2006 Br. 20.   In

In their response to AssistMed's motion, defendants maintain that neither side can recover for fraud.  *See* Ds. July 24, 2006 Br. 21 ("Defendants want to be perfectly clear: Defendants contend that all fraud claims are barred by the plain language of the License Agreement and under [*Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997),] as a matter of law.").  They oppose dismissal of their own fraud claims if the court rejects their arguments regarding *Schlumberger*.  *Id.* ("[I]f the Court rejects CHS's arguments regarding *Schlumberger*, CHS's fraud claims withstand summary judgment . . . .").  Although the court has not found it necessary to reach defendants' relevant arguments——e.g., the *Schlumberger* bar——in deciding defendants' motion, it has dismissed AssistMed's fraud claim.  It therefore appears that defendants do not seek to recover for fraud, and the court dismisses the fraud counterclaims without prejudice.[25]

---

¶ 31(d) of their November 16, 2005 answer to AssistMed's first amended complaint (because defendants have moved to dismiss the second amended complaint, they have not yet been required to answer it), defendants assert fraudulent inducement as a defense. Defendants do not indicate, however, that they desire to litigate a fraudulent inducement defense separately from a fraudulent inducement counterclaim.  The court thus assumes that it need not address this defense and that it has effectively been withdrawn.

[25]This conclusion applies as well to defendants' fraudulent inducement defense.  *See supra* at note 24.

*     *     *

For the reasons stated, defendants' June 13, 2006 motion to dismiss is granted in part and denied in part as moot, and their June 30, 2006 motion for partial summary judgment is granted in part and denied in part. AssistMed's June 30, 2006 motion for summary judgment is denied as moot.[26]

**SO ORDERED.**

December 14, 2006.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

[26]As noted *supra* at note 4, because defendants have withdrawn their claim under the Texas Uniform Declaratory Judgments Act, the court need not reach this ground of AssistMed's motion. And as explained *supra* at § VII, the court is dismissing defendants' fraud counterclaims without prejudice. Therefore, although the court is denying AssistMed's motion, defendants' claims under the Texas Uniform Declaratory Judgments Act and for fraud are no longer pending.